UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　　　　Plaintiff,<br><br>　vs.<br><br>DUSTIN ECK,<br><br>　　　　　　　Defendant. | CR. 18-50058-JLV<br><br><br>ORDER |

## INTRODUCTION

Defendant Dustin Eck, appearing *pro se*, filed a motion for compassionate release.  (Dockets 77-78 & 78-1).  Pursuant to the May 1, 2020, Standing Order 20-06, the Federal Public Defender for the Districts of South Dakota and North Dakota ("FPD") and the United States Attorney for the District of South Dakota filed records, submissions and briefing on Mr. Eck's motion.  (Dockets 80-81, 85 & 89).  For the reasons stated below, defendant's motion is granted.

## STANDING ORDER 20-06

Standing Order 20-06,[1] captioned "Establishing a Procedure for Compassionate Release Motions Under the First Step Act," put in place "a procedure for submission and consideration of compassionate release motions under the First Step Act, 18 U.S.C. § 3582(d)(l)(A), in the wake of the spread of the COVID-19 virus into the federal prison system."  (SO 20-06 at p. 1).  Under

---

[1]See https://www.sdd.uscourts.gov/so2006 ("SO 20-06").  SO 20-06 was amended on October 21, 2020, after this case was ripe for resolution.  See https://www.sdd.uscourts.gov/socraa.  The amendments have no impact on the court's analysis of this case.

the order, the FPD is automatically "appointed to represent all defendants in criminal cases: (a) who previously were determined to be entitled to appointment of counsel or who are now indigent; and (b) who may be eligible to seek compassionate release under the First Step Act." Id. ¶ 1.  The initial step for the FPD is to

> communicate a recommendation to inmates interested in compassionate release that they immediately submit requests for compassionate release to the warden of the facility in which they are detained, if they have not done so already.  These communications will include the recommendation that the prisoner describe their proposed release plan.

Id. ¶ 2.

By the standing order, "within two business days of filing all motions for compassionate release[,]" the FPD and the United States Attorney for the District of South Dakota are "to place [the defendant] into one of four categories[.]" Id.  at p. 2 ¶ 4.  Those categories are:

> a.    High Priority Cases where there exists some combination of: (i) medical issues that correspond to the categories outlined in the commentary to U.S.S.G. § l.B.1.13; (ii) recognized COVID-19 risk factors in the inmate's medical history; and/or (iii) imprisonment in a federal facility known to have a serious COVID-19 outbreak in its population. . . .

> b.    Intermediate Priority Cases where identified medical issues and/or COVID-19 risk factors and/or institutional concerns are less extreme than High Priority Cases.

> c.    Low Priority Cases where there are no identifiable medical issues or COVID-19 risk factors.

> d.    Unknown Risk Cases where there is a lack of sufficient information to categorize the request for compassionate release.

2

Id.  The FPD and U.S. Attorney are to "immediately report the categorization

. . . to the Clerk of Court and the Probation Office."  Id.  The standing order

contains provisions for sharing of critical information among the FPD, U.S.

Attorney, Probation Office and court.  Id. ¶ 5.  The priority of briefing is set

according to the different categories of assignment of a defendant.  Id. ¶¶ 6-8.

## FACTUAL BACKGROUND

On July 2, 2019, defendant Dustin Eck was sentenced to 108 months in

custody for conspiracy to distribute a controlled substance, methamphetamine,

in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(B) and 846.  (Docket 65).  This

sentence was at the bottom of the applicable United States Sentencing

Guidelines ("U.S.S.G.") range, which was 108 to 135 months based on a total

offense level of 29 and the defendant's criminal history category of III.  (Docket

65-1).  The court later reduced Mr. Eck's sentence to 48 months.

Mr. Eck is currently an inmate at FCI Mendota in California.  (Docket 80

at p. 319).  The parties agree and the Bureau of Prisons (BOP) Inmate Locator

confirms Mr. Eck has a scheduled release date of July 16, 2022.  (Dockets 82

at p. 1; 86 at p. 1; and https://www.bop.gov/inmateloc/ (last accessed Nov. 3,

2020).  As of this date, Mr. Eck has served about 40.8 percent of his full term

of incarceration, and under his current status in the BOP, his home detention

eligibility date is February 21, 2022.  (Docket 80 at p. 319).  Mr. Eck is 36

years old.  (Docket 82 at p. 1).

Mr. Eck's *pro se* motion seeks compassionate release on the basis of extraordinary and compelling reasons in light of his personal health during the COVID-19 pandemic.  (Docket 78).  Mr. Eck's current health conditions most relevant to his motion for compassionate release are:

- Type 2 diabetes mellitus with neuropathy.  (Docket 80 at pp. 314-15);

- Hyperlipidemia.  Id.;

- Essential (primary) hypertension.  Id.;

- Allergic rhinitis.  Id.; and

- Asthma.  Id.

The ongoing nature and severity of these conditions are reaffirmed throughout Mr. Eck's medical records.  See Dockets 80-81 & 89.  Mr. Eck's medical records also disclose he suffers from various mood and substance use disorders and physical ailments, such as chronic lower back pain from an injury that required multiple surgeries.  See id.

Within the past several months, Mr. Eck's diabetes and associated neuropathy have worsened, requiring him to work with his doctors to adjust his treatment regimen.  See Docket 82 at p. 8.  Just over a year ago, an A1C test revealed Mr. Eck's blood sugar was just slightly above the threshold level indicative of diabetes.  See Docket 80 at p. 287 (showing an A1C reading of 6.5 and noting a result over 6.4 indicates a person is diabetic).  Mr. Eck was tested again on two occasions this past summer in June and July, and by that time

his levels had risen to 10.2 and 8.2 respectively.  Id. at pp. 182, 186.  Around that same time, Mr. Eck reported to his doctor that his "neuropathy is getting worse," describing the pain in his feet and lower legs as like "[p]ins and [n]eedles" and stating he "couldn't feel his right toes as much."  Id. at pp. 6-7. He also reported issues with his digestive system, another symptom of diabetic neuropathy, and requested related follow up care.  Id. at p. 6; https://www. mayoclinic.org/diseases-conditions/diabetic-neuropathy/symptoms-causes/ syc-20371580.  Just a couple months earlier in May 2020, Mr. Eck had sustained a wound that his doctor reported was "slow healing"—a common sign someone has high blood sugar and diabetes.  Id. at p. 47, 148.

In August, in response to Mr. Eck's worsening condition in the preceding months, his doctors changed his medication regimen and ordered that he receive weekly blood sugar tests in order to more effectively manage his diabetes.  Id. at pp. 1-3.  In September, doctors augmented Mr. Eck's medication regimen for his diabetes again, ordering nightly insulin injections. See Docket 89 at p. 14.  Mr. Eck's current prescriptions include medications for asthma, hypertension, hyperlipidemia, allergic rhinitis, anxiety disorder and chronic back pain, in addition to those for his diabetes.  (Docket 80 at pp. 1-3). Time will tell whether his current medications will stabilize his blood sugar levels and reduce his diabetic neuropathy.

Unfortunately, implementation of Mr. Eck's new medication regimen has created new barriers to his ability to successfully manage his diabetes and

5

other health conditions while incarcerated.  Mr. Eck reports his "living situation has deteriorated" even since doctors ordered the latest changes in September.  (Docket 92 at p. 1).  He explains, "[b]ecause FCI Mendota cannot accommodate insulin injections in the regular housing area, [he] had to be transferred to the Special Housing Unit (SHU) . . . . [and] has been there ever since."  Id. at pp. 1-2.  He is "worse off in many ways" in the SHU than he was in FCI Mendota's regular housing unit because the heightened measures of confinement and restrictions on commissary in the SHU restrict his ability to get sufficient exercise and prevent him from keeping "a range of foods in his cell to treat any low blood sugar spells . . . and control his diet," both "key components for managing diabetes, obesity [and] hypertension."  Id. at p. 2-3. Mr. Eck expects to be in the SHU at FCI Mendota "until he can be transferred to a facility that provides a higher level of medical care and can provide insulin to inmates living in a regular housing unit," but that will not happen until COVID-19 related transfer restrictions are lifted or loosened.  Id. at p. 3.

Addressing the 18 U.S.C. § 3553(a) factors, Mr. Eck emphasizes his "limited criminal history," noting that "[a]ll of his prior convictions were at least five years before the present case."  (Docket 82 at p. 14).  He "has not ha[d] any disciplinary violations in custody."  Id. (citing Docket 80 at p. 316).  During his time in prison, he has "taken dozens of continuing education courses."  Id. (citing Dockets 80 at p. 317 (continuing education transcript) & 78-1 at pp. 4-6 (certificates of completion from Turning Point Program)).  "In light of his limited

6

criminal history and exemplary prison record," Mr. Eck contends he "would not pose a danger to the community if released." Id.  Imposing home confinement as a condition of supervised release would, he argues, constitute a "significant deprivation of liberty and a serious consequence[] for [his] conduct giving rise to this case," ensuring that his "sentence of time served would be sufficient, but not greater than necessary to accomplish the goals of federal sentencing." Id.

Mr. Eck represents that he has a "safe, stable, and supportive environment to return to when he is released." Id. at p. 15.  He will live with his mother in her home in Johnstown, Colorado, and will work as a caretaker for his elderly and chronically ill grandfather who lives nearby.  See id.; Docket 78-1 at pp. 1-3.  His grandfather, mother and father will support him during his transition back into society post-incarceration.  (Docket 78-1 at pp. 1-3).

## MR. ECK'S CLASSIFICATION

On August 14, 2020, the FPD and the U.S. Attorney filed a notice of categorization of compassionate release motion.  (Docket 79).  They jointly "agree [Mr. Eck's] case should be categorized as an Intermediate Priority case." Id.

## ANALYSIS

Section 3582(c) permits the district court to consider a prisoner's request for compassionate release after he exhausts the administrative remedies mandated by the statute.

7

> [T]he court . . . upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that . . . extraordinary and compelling reasons warrant such a reduction . . . and that such a reduction is consistent with the applicable policy statements issued by the Sentencing Commission . . . .

18 U.S.C. § 3582(c)(1)(A)(i).

The court finds Mr. Eck exhausted the administrative procedure provision contemplated by § 3582(c)(1)(A).  On May 29, 2020, Mr. Eck made a request to Warden C. Lepe at FCI Mendota to grant him compassionate release pursuant to 18 U.S.C. § 3582(c)(1) based on his preexisting medical conditions, which put him at "high risk of complications from COVID-19," should he contract the virus.  (Docket 80 at p. 324).  Warden Lepe denied Mr. Eck's request on June 3, 2020.  Id. at p. 325.  The warden's decision was based on the standard for "extraordinary or compelling reasons" delineated in "Program Statement No. 5050.50, Compassionate Release/Reduction in Sentence: Procedures for Implementation of 18 U.S.C. §§ 3582(c)(1)(A) and 4205(g)[.]"  Id. The factors in Program Statement 5050.50 are the same as those in the United States Sentencing Guidelines ("U.S.S.G.").  Compare Docket 80 at p. 325 and U.S.S.G. § 1B1.13 cmt. n.1(A)-(C) (U.S.S.G. 2018).  However, the court's consideration of extraordinary and compelling reasons under 18 U.S.C.

8

§ 3582(c)(1)(A)(i) is not tied to U.S.S.G. § 1B1.13 cmt. n.1(A)-(C) or the COVID-19 home confinement provisions of the CARES Act, Pub. L. No. 116-136, Section 12003(b)(2).

"Section 3582(c)(1)(A)(i) does not attempt to define the 'extraordinary and compelling reasons' that might merit compassionate release."  United States v. McCoy, No. 20-6821, 2020 WL 7050097, at *3 (4th Cir. Dec. 2, 2020).  That task was left to the United States Sentencing Commission.  "[I]n promulgating general policy statements regarding the sentencing modification provisions in section 3582(c)(1)(A) . . . [the Sentencing Commission] shall describe what should be considered extraordinary and compelling reasons for sentence reduction, including the criteria to be applied and a list of specific examples."  28 U.S.C. § 994(t).

Prior to the First Step Act, the Sentencing Commission established four categories for "extraordinary and compelling reasons for sentence reduction, including the criteria to be applied and a list of specific examples."  28 U.S.C. § 994(t).  Those categories generally focus on the defendant's age, medical condition, family situation and any other reasons the BOP deems to be extraordinary and compelling.  U.S.S.G. § 1B1.13 cmt. n.1.  The four categories have not been updated since December 2018 when the First Step Act became law.[2]

---

[2]The United States Sentencing Commission lacks a quorum and "currently has only two voting members, two shy of the four it needs to amend the [U.S.S.G.]."  United States v. Marks, 455 F. Supp. 3d 17, 24 (W.D.N.Y. 2020) (references omitted).

The United States Courts of Appeals for the Second, Fourth, Sixth and Seventh Circuits have addressed the court's authority under the First Step Act.[3]  See United States v. Brooker, 976 F.3d 228 (2d. Cir. 2020); McCoy, 2020 WL 7050097; United States v. Jones, No. 20-3701, 2020 WL 6817488 (6th Cir. Nov. 20, 2020); and United States v. Gunn, Case No. 20-1959, 2020 WL 6813995 (7th Cir. Nov. 20, 2020).

The Second Circuit identified the question at the heart of these cases, which is "whether the First Step Act allows courts independently to determine what reasons, for purposes of compassionate release, are 'extraordinary and compelling,' or whether that power remains exclusively with the BOP Director as stated in Application Note 1(D)." Brooker, 976 F.3d at 234.  The Second Circuit concluded "that, despite Application Note 1(D), the First Step Act freed district courts to exercise their discretion in determining what are extraordinary circumstances." Id.  The court held the language of U.S.S.G. § 1B1.13 "is clearly outdated and cannot be fully applicable." Id. at 235.  "[T]he First Step Act freed district courts to consider the full slate of extraordinary and compelling reasons that an imprisoned person might bring before them in motions for compassionate release.  Neither Application Note 1(D), nor anything else in the now-outdated version of Guideline § 1B1.13,

---

[3]The United States Court of Appeals for the Eighth Circuit had two clear opportunities to address this issue but declined to do so.  United States v. Rodd, 966 F.3d 740 (8th Cir. July 16, 2020) and United States v. Loggins, Jr., 966 F.3d 891 (8th Cir. July 31, 2020).

limits the district court's discretion." Id. at 237; see also Gunn, 2020 WL 6813995, at *2 (agreeing with the Second Circuit that the Guidelines Manual "does not curtail a district judge's discretion"); Jones, 2020 WL 6817488, at *9 ("In cases where incarcerated persons file motions for compassionate release, federal judges . . . have full discretion to define 'extraordinary and compelling' without consulting the policy statement § 1B1.13."); McCoy, 2020 WL 7050097, at *8 ("As of now, there is no Sentencing Commission policy statement 'applicable' to the defendants' compassionate-release motions, which means that district courts need not conform, under § 3582(c)(1)(A)'s consistency requirement, to § 1B1.13 in determining whether there exist 'extraordinary and compelling reasons' for a sentence reduction.").

The court retains its independent authority "to consider the full slate of extraordinary and compelling reasons that an imprisoned person might bring before [the court] in motions for compassionate release." Brooker, 976 F.3d at 237. See also McCoy, 2020 WL 7050097, at *9 (same); Jones, 2020 WL 6817488, at *9 (same); Gunn, 2020 WL 6813995, at *2 (same). The purpose of the First Step Act was to expand the availability of compassionate release based on judicial findings of extraordinary and compelling reasons without being restricted to those categories identified by the Sentencing Commission or the rationale used by the BOP before the passage of the First Step Act.

Mr. Eck argues he meets the criteria of U.S.S.G. § 1B1.13, application notes 1(A)(ii) and 1(D). (Docket 82 at pp. 3-12, 12-14). He submits that "his

underlying health conditions, especially his Type 2 diabetes, hypertension, asthma, and obesity, increase his risk of developing serious complications from COVID-19." Id. at p. 3.  The conditions of his incarceration prevent Mr. Eck from taking the "self-protective measures the general public can take," like socially distancing and implementing other heightened precautions recommended by the CDC related to sanitation and avoiding close contact with others, especially when spending time in enclosed or shared spaces.  Id. at p. 11; see https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/prevention.html (last updated Oct. 28, 2020).  Mr. Eck is currently housed in the SHU at FCI Mendota because the facility "cannot accommodate insulin injections in the regular housing area."  (Docket 92 at pp. 1-2).  In the SHU, he is "confined in his cell with his cellmate for 24 hours a day."  Id. at p. 2.  He receives "all of [his] meals and ha[s] a toilet and a shower in [his] cell."  Id. Recently, recreation time for inmates in the SHU has been significantly restricted, and at times even eliminated, due to dangerous air quality caused by wildfires in the region.  Id.  "[I]nmates in the SHU are not allowed to order commissary, so [Mr.] Eck cannot keep a range of foods in his cell to treat any low blood sugar spells."  Id.  In sum, Mr. Eck was transferred to the SHU because it is the only housing unit at FCI Mendota where the facility is capable of providing him with the daily medical care he needs to treat his diabetes, but his transfer has come with significant tradeoffs.  "[C]onfinement in the SHU

12

has cut off his ability to exercise and control his diet, both key components for managing diabetes, obesity, [and] hypertension." Id. at pp. 2-3.

The government acknowledges Mr. Eck's chronic health conditions constitute extraordinary and compelling reasons permitting a sentence reduction in the face of the COVID-19 pandemic, stating:

> [D]uring the current COVID-19 pandemic, an inmate who presents one of the risk factors on the . . . CDC list, as confirmed by medical records, and who is not expected to recover from that condition, presents an extraordinary and compelling reason allowing compassionate release under the statute and guideline policy statement, even if that condition in ordinary times would not allow compassionate release. This condition presents "a serious physical or medical condition . . . that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover," U.S.S.G. § 1B1.13 cmt. n. 1(A)(ii)(I), in that the inmate's ability to provide self-care against serious injury or death as a result of COVID-19 is substantially diminished, within the environment of a correctional facility, by the chronic condition itself. The medical records currently before the Court establish that [Mr.] Eck has a current diagnosis of type 2 diabetes mellitus, so the extraordinary and compelling standard is met.

(Docket 86 at p. 11). Despite this acknowledgement, the government asserts Mr. Eck's "medical records, themselves, do not support that [Mr. Eck] is unable to provide self-care" and notes the "Bureau of Prisons has made significant changes to its operations" in response to the pandemic. Id. at pp. 10-11.

The government asserts Mr. Eck's "medical diagnosis is not the sole consideration," and that a sentence "reduction [must be] consistent with applicable policy statements issued by the Sentencing Commission"—namely,

13

the factors in 18 U.S.C. § 3553(a).  Id. at p. 19.  The government contends consideration of the 3553(a) factors weighs against Mr. Eck's release.  Id.

First, the government argues Mr. Eck is a danger to the community because of his "history of continued narcotics activity," which has included buying, transporting, selling, distributing and using methamphetamine.  Id. at p. 21.  As further indication of Mr. Eck's alleged dangerousness, the government points to Mr. Eck's possession of a loaded firearm during the traffic stop where law enforcement found methamphetamine in Mr. Eck's vehicle, leading to the instant case.  Id.  It also notes Mr. Eck's criminal history, which "includes convictions for domestic battery, battery, and violating a protective order."  Id.

Second, the government submits the crime for which Mr. Eck was convicted is "serious, and he has only served approximately 37% of his sentence," as of the date he filed his motion for compassionate release.  Id.  In its view, a reduced sentence "would not be a deterrent" to Mr. Eck from engaging in similar criminal behavior again in the future, and it would create a "disparity in sentencing" if Mr. Eck serves "far less than [his originally] imposed sentence while others similarly situated remain imprisoned."  Id. at pp. 21-22.

Finally, the government asks that if the court grants Mr. Eck's motion for compassionate release, it "substitute a term of probation or supervised release with a condition of home confinement for the duration of [Mr. Eck's] current sentence of imprisonment" rather than releasing Mr. Eck outright.  Id. at

pp. 22-23.  It also asks that "any order provide release only after [Mr. Eck's] release and travel plans are in place, and [for the court to] set any release 14 days from the date of its order to accommodate BOP's ability to quarantine [Mr. Eck] prior to his release to protect the community from potential further spread." Id. at p. 23.

In reply, Mr. Eck argues he has shown extraordinary and compelling reasons warranting compassionate release under U.S.S.G. § 1B1.13, application note 1(A)(ii) based on his Type 2 diabetes and—if his BMI is the same as or higher than it was the last time his height and weight were measured—obesity.  (Docket 92 at pp. 3-4).  Mr. Eck asserts his hypertension and asthma are additional extraordinary and compelling reasons for his release under U.S.S.G. § 1B1.13, application note 1(D).  Id. at pp. 4-6.  Regarding the 3553(a) factors, Mr. Eck maintains he is not a danger to the community, citing the facts that this is his first felony offense, there is no evidence he engaged in "fighting, threatening, or violent behavior on pretrial supervision" and he has an "exemplary prison record" with "no disciplinary violations." Id. at p. 7.  He argues "home confinement as an additional condition of supervision" would assuage outstanding government concerns about any public safety risk he might pose. Id.  Mr. Eck acknowledges he has served only "37 percent of his full term and 43.5 percent of his statutory term" of incarceration as of the date he filed for compassionate release, but he points out he will be "eligible for home detention on February 21, 2022[,]" and that "many courts have granted

15

compassible release far earlier in the defendant's sentence." Id. at pp. 7-8. Mr. Eck asserts the COVID-19 pandemic puts him "at risk of [his] long, but survivable, sentence[] becoming [a death] sentence" and "changes the sentencing calculation in this case." Id. at 8.

The court finds Mr. Eck met his burden of proof and presents extraordinary and compelling reasons warranting a sentence reduction under § 3582(c)(1)(A)(i).

FCI Mendota currently has eight confirmed active cases of COVID-19 among inmates and seven confirmed active cases among staff.  https://www. bop.gov/coronavirus/ (last visited Dec. 16, 2020).  Among the 955 inmates, however, only 409 have been tested for the virus.  Id.  Of those, 68 have tested positive.  Id.  The facility reports 11 pending COVID-19 tests.  Id.

The Centers for Disease Control and Prevention (CDC) identified factors that increase community spread of COVID-19 and individual risk, including crowded situations, enclosed spaces and close or physical contact among people, especially for longer durations.  https://www.cdc.gov/coronavirus/ 2019-ncov/need-extra-precautions/people-with-medical-conditions.html? CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019- ncov%2Fcovid-data%2Finvestigations-discovery%2Fhospitalization-underlying- medical-conditions.html (last updated Nov. 2, 2020).  Despite BOP's conditions of modified operations implemented to slow the spread of COVID-19 in prisons, the practical reality is that many of the factors increasing community spread

and individual risk of exposure to the virus are simply unavoidable in a prison setting.  See https://www.bop.gov/coronavirus/covid19_status.jsp (last updated Oct. 8, 2020).  This is true for Mr. Eck in FCI Mendota, where currently he is housed in the SHU because of the facility's inability to meet his medical treatment needs in the regular housing unit.  (Docket 92 at pp. 1-3).  In the SHU, he is confined for 24 hours a day in his cell, which he shares with another inmate.  Id. at p. 2.  He and his cellmate share a toilet and shower.  Id.  His ability to leave his cell to exercise outside—something that is crucially important for managing his severe health challenges—has been significantly restricted in recent months as the combination of the COVID-19 pandemic and historic wildfires on the West Coast has forced FCI Mendota to alter its regular operations.  Id. at pp. 2-3.

Mr. Eck's condition has worsened in recent months, and he cannot be transferred to another facility that is capable of providing superior medical care until BOP lifts or loosens its COVID-related restrictions on transfers.  Id. at p. 3.  "BOP facilities are classified by 'Care Level' based on the local BOP health care workforce and the range of available community-based services."  https://www.bop.gov/resources/pdfs/legal_guide_march_2019.pdf at p. 27.  Every inmate is also assigned a medical Care Level.  Id.  Now that Mr. Eck requires daily insulin injections to treat his diabetes, as well as a host of other medications to manage that condition and others, he is likely at least a Care Level 2.  Id. (noting Care Level 2 inmates are those with conditions such as

17

"medication-controlled diabetes" or who are "stable outpatients, requiring at least quarterly clinician evaluation").  FCI Mendota is designated a Care Level 1 facility, the lowest of four levels.  https://www.prisonerresource.com/federal-prisons/fci-mendota/.  It is clear FCI Mendota is not equipped to manage the medical care of individuals like Mr. Eck who have significant health challenges. It is less clear when the conditions of this pandemic will subside and allow for Mr. Eck's transfer to another BOP facility or how Mr. Eck would fare in FCI Mendota's SHU until that time.

The risk of exposure to COVID-19 is most concerning for individuals who have certain medical conditions which make them more likely to experience severe illness should they contract the virus.  Mr. Eck is among this at-risk population.  The CDC has so far identified ten underlying medical conditions that it has found put "[a]dults of any age . . . at increased risk of severe illness from the virus that causes COVID-19."  https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fcovid-data%2Finvestigations-discovery%2Fhospitalization-underlying-medical-conditions.html (last updated Nov. 2, 2020).  Mr. Eck has at least one, and possibly two, of these conditions.  He is diagnosed with type 2 diabetes mellitus.  (Docket 80 at p. 314).  And while Mr. Eck does not have an official diagnosis of obesity, his medical records from the last time his height and

18

weight were measured indicate he had a Body Mass Index (BMI) of just over 30, which would qualify him as obese under the CDC definition.  Id. at p. 233.

The CDC has also found "adults of any age" with any of another dozen conditions "might be at an increased risk for severe illness" if they contract COVID-19.  https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fcovid-data%2Finvestigations-discovery%2Fhospitalization-underlying-medical-conditions.html (last updated Nov. 2, 2020).  Mr. Eck has at least one of these conditions—hypertension—and possibly two, if his BMI is lower than it was when his height and weight were last measured but is still anywhere between the range of 25 and 30, which the CDC considers overweight.  Id.

The CDC also includes moderate to severe asthma in its list of conditions that "might" put people at an increased risk for severe illness if they contract COVID-19.  Id.  Mr. Eck is diagnosed with asthma; however, his condition may not currently qualify as moderate or severe.  The National Asthma Education and Prevention Program identifies the two classifications of asthma of concern to the CDC.

> Moderate persistent asthma.  Asthma is considered moderate persistent if without treatment any of the following are true:
>
> • Symptoms occur daily. Inhaled short-acting asthma medication is used every day.
>
> • Symptoms interfere with daily activities.

19

- Nighttime symptoms occur more than 1 time a week, but do not happen every day.

- Lung function tests are abnormal (more than 60% to less than 80% of the expected value), and PEF [peak expiratory flow] varies more than 30% from morning to afternoon.

Severe persistent asthma.  Asthma is considered severe persistent if without treatment any of the following are true:

- Symptoms:
    - Occur throughout each day.
    - Severely limit daily physical activities.

- Nighttime symptoms occur often, sometimes every night.

- Lung function tests are abnormal (60% or less of expected value), and PEF varies more than 30% from morning to afternoon.

https://www.uofmhealth.org/health-library/hw161158 (bold omitted; last visited Oct. 29, 2020).  Mr. Eck is prescribed an albuterol inhaler for his asthma, but his doctor has directed him not to use it daily.  (Docket 80 at p. 1).  However, Mr. Eck's asthma may be more severe than his current prescription suggests.  Medical records from October 2019 indicate Mr. Eck's asthma is triggered by "smoke, dust, [and] pollen" and that he was using his inhaler "2 puffs 2-3 times per day depending on the time of year," although at times he "goes a month or so without using any doses."  Id. at p. 232.  In April 2020, Mr. Eck requested "an inhaler 'more than every 90 days,' " as his prescription currently provides for, but medical staff advised him that "the next step up would be adding a steroid inhaler," which would require Mr. Eck to be transferred.  Id. at

20

p. 62.  Because Mr. Eck did not want to be transferred at the time, he was not prescribed the steroid inhaler.  Id.

From a careful review of his extensive medical records detailing these conditions, among others he faces, the court finds Mr. Eck's major health issues and risk factors are chronic.  That is, his conditions will only persist and likely worsen over time.  During the COVID-19 pandemic, Mr. Eck's conditions significantly diminish his ability to provide self-care within the environment of a correctional facility, putting him at risk of severe illness—and even death—should he contract the virus.  As mentioned earlier in this order, the government acknowledges this fact.  See supra at p. 13.  The court finds Mr. Eck's chronic and severe medical conditions make him especially vulnerable to COVID-19, even compared to other individuals incarcerated at FCI Mendota or another BOP facility.  Against these findings, the court must consider if compassionate release comports with the § 3553(a) factors.

In Mr. Eck's case, the "nature and circumstances of the offense"— conspiracy to distribute a controlled substance, methamphetamine—is serious. 21 U.S.C. §§ 841(a)(1), 841(b)(1)(B) and 846.  "[T]he history and characteristics of the defendant," requires the court to consider the defendant as a whole person.  Koon v. United States, 518 U.S. 81, 113 (1996).  Mr. Eck has a number of offenses prior to this case, several that are minor traffic violations and others which are more serious, including violation of a protective order,

21

battery and domestic battery, all three having occurred in or before 2012.  (PSR ¶¶ 30-46).  While awaiting sentencing in this case, Mr. Eck demonstrated a commitment to addressing his substance use issues underlying his criminal behavior that led to this case by seeking treatment at a rehabilitation center in Arizona.  Id. ¶¶ 15 & 64.  He has expressed his belief that "treatment should be a continual part of his life."  Id. ¶ 64.  Mr. Eck has no disciplinary violations while in prison, and he has taken a wide variety of continuing education courses while incarcerated.  (Dockets 80 at pp. 316-17; 92 at p. 7).

In the court's view the sentence imposed in Mr. Eck's case "reflect[ed] the seriousness of the offense, . . . promote[d] respect for the law, . . . provide[d] just punishment for the offense . . . [and] afford[ed] adequate deterrence to [future] criminal conduct" by Mr. Eck.  18 U.S.C. §§ 3553(a)(2)(A) & (B).  As of this date, Mr. Eck has served about 40.8 percent of his sentence.  See supra p. 3.  Considering the defendant's serious health condition, his initiative to seek rehabilitative treatment for his substance use issues while awaiting sentencing in this case, and his satisfactory behavior while incarcerated, as well as the supervised release special conditions imposed at sentencing, additional incarceration is not necessary "to protect the public from further crimes of the defendant."  Id. § 3553(a)(2)(C).  Mr. Eck's obligation to comply with the terms of supervised release would best "provide the defendant with . . . correctional treatment in the most effective manner."  Id. § 3553(a)(2)(D).

Incarceration is not the only "kind[] of sentence[] available." Id. § 3553(a)(3).  A noncustodial sentence will limit Mr. Eck's liberty interests through supervised release and he will face harsh consequences if he violates the special conditions activated upon his release from BOP custody.  United States v. Gall, 374 F. Supp. 2d 758, 763 (S.D. Iowa 2005), rev'd, 446 F.3d 884 (8th Cir. 2006), rev'd, 552 U.S. 38 (2007).  Those special conditions promote respect for the law, protect the public and do not constitute any approval of Mr. Eck's past criminal conduct.  Id.

At this juncture, use of the First Step Act will not create "unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." Id. § 3553(a)(6).  The court finds compassionate release is appropriate and Mr. Eck will not pose a danger to the public.

The court does not have authority to modify the defendant's sentence to home confinement.  United States v. Amarrah, Case No. 17-20464, 2020 WL 2220008, at *8 (E.D. Mich. May 7, 2020).  The court does, however, retain the authority to reduce Mr. Eck's sentence to time served.  Following his release from custody, Mr. Eck will remain on supervised release for four years, subject to the mandatory and standard conditions and the special conditions of supervised release imposed in the original sentence.  (Docket 65 at pp. 4-5).

23

Arrangements are in place to transfer supervision to the District of Colorado so Mr. Eck can commence his period of supervised release in that district.

**ORDER**

Good cause having been proven, it is

ORDERED that defendant's motion for compassionate release (Docket 78) is granted.

IT IS FURTHER ORDERD that the defendant's sentence of imprisonment is reduced to time served.

IT IS FURTHER ORDERED that upon his release, Mr. Eck shall reside with his mother at her home in Johnstown, Colorado.

IT IS FURTHER ORDERED that within 72 hours of release from the custody of the BOP Mr. Eck must report, by telephone, 303-844-5424 or 800-616-4385, to the United States Probation and Pretrial Services Office for the District of Colorado in the Byron Rogers United States Courthouse, 1929 Stout Street, Suite C-120, Denver, CO 80294-0005.

IT IS FURTHER ORDERED that Mr. Eck shall remain on supervised release for four years, subject to the mandatory, standard and special conditions of supervision imposed in the original sentence of July 2, 2019. (Docket 65 at pp. 3-5).

IT IS FURTHER ORDERED that the United States Probation Office shall prepare an amended judgment consistent with this order.

24

IT IS FURTHER ORDERED that the Clerk of Court shall deliver a copy of this order to the United States Probation Office and the United States Marshals Service.

Dated December 16, 2020.

BY THE COURT:

/s/ *Jeffrey L. Viken*

JEFFREY L. VIKEN
UNITED STATES DISTRICT JUDGE

25